**James J. MORALE**

v.

**Michael GRIGEL, as Resident Assistant at New Hampshire Technical Institute, Concord, New Hampshire, et al.**

Civ. A. No. 76–211.

United States District Court, D. New Hampshire.

Nov. 9, 1976.

Jon Groetzinger, Jr., McLane, Graf, Greene, Raulerson & Middleton, Manchester, N. H., for plaintiff.

James C. Sargent, Jr., Atty. for the State of N. H., Concord, N. H., for defendant.

## OPINION

BOWNES, District Judge.

This civil rights action, brought under 42 U.S.C. § 1983, concerns the suspension of a student of the New Hampshire Technical Institute for possession of marijuana. Plaintiff contends that his suspension was based upon evidence illegally seized from his dormitory room at the Institute on May 23, 1976, in violation of his Fourth and Fourteenth Amendments rights under the United States Constitution. He claims that the evidence should have been excluded from the disciplinary hearing. He also alleges that his disciplinary hearing and appeal hearing were so partial and lacking in procedural safeguards as to violate his rights under the Due Process Clause of the Fourteenth Amendment. He seeks an injunction reinstating him at the school and a declaration that the searches of May 22 and 23, and the school's disciplinary procedures were violative of the Constitution. U.S. Const. Amend. I and IV. Jurisdiction is based upon 28 U.S.C. § 1343(3), (4).

Plaintiff, James Morale, a citizen of the United States and a resident of Barre, Vermont, was a first year student at the New Hampshire Technical Institute (NHTI) during the 1975–76 academic year. He lived in the men's residence hall on the NHTI campus.

Defendant Michael Grigel was a second year student at NHTI and was employed by NHTI as a Resident Assistant at the men's residence hall during the 1975–76 academic year.

Defendant Dr. David E. Larrabee, Sr., is and was, at all relevant times, the Director of NHTI. Under NH RSA 188–A:2–a (Supp.1975), Larrabee is "responsible for the administration and operation of the technical institute . . . ." Larrabee, as Director, was responsible for the procedures followed during Morale's disciplinary hearing and heard his appeal therefrom.

Defendant Charles L. Downs is a teacher at NHTI and was the chairperson of the Level II Committee that heard Morale's disciplinary hearing.

Defendant David Bashaw is a teacher at NHTI and was the Advisor to the Judicial Committee at NHTI at all relevant times.

Defendant Edith Lane is the Nurse at NHTI and the Head Resident at the men's residence hall. She participated in two of the searches in question, signed the incident report, and was a witness against Morale.

Defendant Gene Morrisette is a Campus Security Officer at NHTI. He signed the incident report and testified against Morale at his disciplinary hearing.

Defendants Sewade, Boulay, Andrews, Tunney, McCraren, St. Lawrence, Moore and Hobden are sued as members of the Level II Committee which heard Morale's disciplinary hearing and found him guilty.

## THE FACTS

The facts as found by this court are based upon the testimony adduced at the evidentiary hearings, the exhibits submitted and the affidavits of Gene Morrisette, Security Officer at NHTI, and Edith Lane, Head Resident and Nurse of NHTI.

Sometime during Friday, May 21 or Saturday, May 22, 1976, the stereo of Joseph Martin, a student at NHTI, was stolen from his room. He discovered the theft on Saturday evening. At approximately 9:30 P.M., Michael Grigel, the dormitory student

Resident Assistant, indicated to Lane that he wanted to conduct a room check for the stereo. Lane told Grigel that he could not check rooms alone and accompanied him. See Defts.' Ex. 16 at 7; Pl's. Ex. 1 at 5, 27; Affidavit of Fillion, Larrabee and Lane, August 17, 1976. They testified that, if the student was in his room, they asked him for permission to search; however, they added that they also checked the rooms of absent students, using Lane's pass key to gain entry.

In the course of the room-to-room search for the stereo, Morale's room was checked. Morale let Grigel and Lane into his room, but was not asked and did not give them formal permission to enter or to search. Morale testified, as did other students, that he simply assumed that Lane and Grigel had the authority to check the rooms. Although Grigel and Lane did not look into drawers, they checked the closet and the space under the bed. After he noticed that a tile was out of place, Grigel looked into the area above the suspended ceiling and saw the silhouette of a small bag above the ceiling tiles. Grigel and Lane testified that there was a "purple haze" in Morale's room, which they both assumed to be marijuana smoke. Sometime later, Lane heard Grigel instruct Morale to get rid of his "pot."

It is clear that this initial inspection on Saturday evening was performed under the authority granted Lane and Grigel by NHTI in their respective capacities as Head Resident and Resident Assistant. They acted in their official capacities pursuant to the power NHTI assumes under Resident Hall Rules.

> The Resident Assistant is also responsible for the conditions of student rooms and public areas on their floor which include vandalism, care on inventory and general cleanliness. [sic] Defts.' Ex. 16 at 5.

See also Pl's. Ex. 1 at 27.

When they did not find the missing stereo in the dormitory, Grigel announced that he would search the cars of dormitory residents. Apparently, all students who owned cars complied with Grigel's demand to allow such a search. After the search of the automobiles and when the stereo was not found, Lane reported the theft to the Concord Police.

Sometime after the search of the automobiles, Grigel decided to check Morale's room again. He resolved to do so because he had seen the dislocated ceiling tile in Morale's room, a stereo could have been hidden above the suspended ceiling, and because he had not looked at the entire area.

Grigel did not have a pass key to the dormitory rooms, and Morale's room was, at that time, locked. Joe Martin and James Bartlett accompanied him. Grigel stated to them that he was convinced that Morale had stolen the stereo and that he wanted to search Morale's room again. He tried to open Morale's door by using a plastic card, and, when he failed, he asked Bartlett to get the pass key from Lane. He instructed Bartlett to tell Lane that he, Bartlett, had locked himself out of his room and needed a key to get in. Bartlett did so, and the three of them went into Morale's room and searched it for approximately five minutes, looking specifically above the ceiling tiles. Grigel conducted the search without Lane and without any actual authority. They found nothing except that Bartlett saw a crumpled object above the ceiling. There was testimony that Grigel, at this time, was angry enough to "have laid [Morale] on the floor." Brzekaza Testimony. Grigel then returned the pass key to Lane.

By Sunday morning, May 23, 1976, there was general concern about the stereo and several other missing items, including some marijuana, and tempers were riled. Two students, Warren Winchester and Steve Canning, went to talk to Morale in his room sometime that morning. After some pounding on the door, Morale let them in. They entered the room, but did not search it. They retired to Steve Schneider's room where the three of them discussed the events. There was testimony that those three students returned to and searched Morale's room. Then Grigel and Bartlett joined them. Bartlett told the group of the crumpled paper he had seen above the ceiling tiles. They decided to confront Morale

once again. Grigel was on duty as a proctor at the time and assumed a general authority to search for stolen property. The group pounded on Morale's door and went in when Morale opened it. There was yelling and threats against Morale, and Grigel was particularly upset. He told Morale to get the "stuff" back within one hour "or else." By that, he meant the stereo, the missing marijuana and, perhaps, a missing watch belonging to Bartlett. Morale was very upset and denied taking anything. The students inspected the room thoroughly, including the drawers, closets, and suspended ceiling. They found only an empty crumpled cracker wrapper above the ceiling tiles. In the course of the search, Grigel knocked over and broke a glass jar. Tempers flared, and Morale told them to get out. At approximately that time, Steve Canning took a silver colored plastic film container off a bookshelf near the door and opened it. It is agreed by all parties that there were marijuana seeds in the container. Morale said that they were his. Canning left the film canister on the desk, and the group departed.

Morale left his room and went downstairs with Robert Waldron, another NHTI student. Upon the advice of Waldron, he tried to locate Lane. They found her approximately one-half hour later and told her of the searches and threats. She went to Schneider's room to tell the students to leave Morale alone. Grigel immediately related that they had seen some marijuana in Morale's room. Lane proceeded there at once with Grigel and several others to verify this report. She knocked and, when there was no answer, opened the door with her pass key. Grigel went in, removed the canister and a pipe from the desk and presented them to Lane. She took the items downstairs and confronted Morale with them. She asked him what the items

were and to whom they belonged. He explained that he had found some marijuana seeds and a pipe in his belongings as he packed. He acknowledged that they were both his. Lane informed him that she would have to apprise the authorities of the situation.

On Monday morning, May 24, Grigel reported the affair to Gene Morrisette, the campus Security Officer. Grigel related the story of the missing stereo, the Saturday night search with Lane and Sunday's confiscation of the marijuana. He did not tell of any of the searches conducted out of the presence of Lane. Morrisette wrote up the incident report. Pl's. Ex. 4. Lane subsequently took the seeds and the pipe over to the security office and signed the report. The seeds were not analyzed and were never formally determined to be a "cannabis-type drug." NH RSA 318–B:26(I)(c) (Supp. 1975).

At approximately 10:00 A.M. that morning, the Institute Judicial Committee met in the office of Dr. Larrabee, the Director of NHTI. Larrabee asked Morrisette to bring Morale to the office. Morrisette got Morale out of class, and advised him of his right to remain silent and his right to be represented by "counsel." Morrisette asked Morale about both the stereo and the pipe and marijuana. Morale disclaimed any knowledge of the stereo, but admitted that the seeds and pipe were his. He expressed concern over what might be the consequences of the looming disciplinary proceeding.

In the meantime, Larrabee was meeting with Lane and Charles L. Downs, a professor at NHTI and the chairperson of the Institute Judicial Committee. Upon the advice of the advisors of the Level I Committee and the Judicial Committee,[1] Larrabee decided to bypass the Level I hearing[2] and

---

1. See Pl's. Ex. 1 at 8; Defts.' Ex. 16 at 17.

2. Pl's. Ex. 1 at 10, *Social Discipline* § 1(a)(1).
   1. Disciplinary Levels
   The judicial process will be the responsibility of the Judicial Committee. This Committee

will function at two (2) Levels, Level I and Level II.
a. Level I will consist of three student committees:
1. The Men's and Women's Residence Hall Judicial Committees will be responsible for

to hold a Level II hearing[3] as soon as possible. This decision was made because there was not enough time to hold both a Level I and a Level II hearing before the end of the school year. Possession of drugs is a major offense, and the Level I Committee could have referred the case to Level II were it not appealed by Morale.[4] The school year ended Thursday, May 27, and students were required to be off campus by that date. Because student representatives constitute one-half of the Level II Committee, it was imperative that the hearing be held before Thursday. Therefore, Larrabee decided to bypass the Level I hearing and to proceed immediately to Level II.

Morrisette brought Morale into Larrabee's office. Downs advised Morale that a Level II hearing would be held on Wednesday, May 26. Pl's. Ex. 5. Downs read the incident report to Morale and told him of his right to have "counsel" at the hearing and to confront and cross-examine the witnesses against him. Downs tried to give Morale a copy of the incident report, but Morale refused it. Because he knew that he would be chairing the disciplinary hearing, Downs left the room as the others began to discuss the situation.

■ There is considerable debate between plaintiff's and defendants' witnesses as to whether Morale was confronted with the seeds and the pipe and whether he admitted to Larrabee that they were his. I make the following specific findings: the canister of marijuana seeds and the pipe were in the Director's office at the time of this meeting, and they were shown to Morale. Morale admitted that they belonged to him. Larrabee then ordered Morale off campus within one hour. He did this because he believed that Morale's presence on campus threatened the safety and health of others. Morale made some arrangements for the care of his property and left campus. While the wisdom of Larrabee's decision might be questioned, it does not rise to the level of a constitutional deprivation.

By the time of the Wednesday hearing, Morale had engaged an attorney to represent him. He arrived with several witnesses to testify on his behalf. It is clear that the Morale disciplinary hearing broke precedent in many respects, not the least of which was the presence of legal counsel. The Committee initially held, as was their practice, a closed session at which the accusers and the Committee members were present. This closed session was to ensure that the Committee understood both the procedural rules and the issues at hand. The Committee members testified that, at this stage, a written statement from Morale would have been accepted to aid them in this initial consideration of the matter.

At the hearing, Morale's counsel demanded that a record of the hearing be made and that the hearing be open to the student body. These requests were initially granted as not being too unreasonable. Morale's counsel then raised a number of "procedural" objections such as the lack of a Level I hearing and the failure of the Judicial Committee to provide Morale and his counsel with a copy of the incident report. Counsel further requested that the Level II Committee make written findings with an explanation of their decision and the punishment to be meted out. Finally, counsel attempted to introduce a motion to suppress the evidence that he contended had been illegally seized in the dormitory searches. These requests were denied, and it is fair to say that they confounded and angered the

all cases which originate within the residence hall.
*See also* Pl's. Ex. 1 at 27; Defts.' Ex. 16 at 15.

3. Pl's. Ex. 1 at 10, *Social Discipline* § 1(b).
   1. b. Level II will consist of the Institute Judicial Committee. The faculty members elected by faculty at large and student members elected by the Men's and Women's Residents and the Student Senate to this committee will be responsible to consider all cases referred or appealed to them from Level I and cases which originate off campus.
   *See also* Pl's. Ex. 1 at 27; Defts.' Ex. 16 at 17.

4. Pl's. Ex. 1 at 10, *Social Discipline* VI:
   The decision of Level I may be referred to Level II for further review by the Director, Dean of Students, or members of Level II.
   *See also* Defts.' Ex. 16 at 17, Art. 3(B).

Committee. The Committee members were intimidated by the legalistic and technical nature of counsel's requests and by his indications that, if they did not comply with his ultimatums, they would be subject to civil litigation. The hearing ended in turmoil as the Committee retreated to the Director's office.

Larrabee called the Attorney General's office and was advised to proceed with the hearing exactly as he would under normal circumstances. The Level II Committee decided not to retain its own counsel. Larrabee then took charge of the meeting. He closed the hearing to all except those involved and instructed Morale that no record would be made of the hearing. He further denied Morale's request that there be written reasons for the decision.

It is unclear as to exactly when, in the sequence of events, Morale left the hearing, but when he and his counsel clearly understood that their motion to suppress the evidence was not going to be entertained by the Committee, they decided to present no evidence and departed. They also requested their witnesses not to testify. Therefore, the Committee heard no evidence other than the evidence presented by Morale's accusers: Grigel, Lane and Morrisette. These witnesses told the Committee that Morale had admitted to them at separate times that the marijuana seeds were his.[5] Upon this evidence, by a vote of three to four with one abstention, Morale was found guilty of Possession of Marijuana and suspended until January, 1977. Pl's. Ex. 7, 8. Downs personally delivered the Disposition Report to Morale.

That evening, Morale had a discussion with Larrabee at which time Morale explained his version of the story and intimated that he might have been "set up" by Grigel. Larrabee told Morale that, if he were to retain an in-house advisor in the place of his legal counsel, his chances would be greatly improved. Larrabee explained that, upon appeal, he might remand the case back to Level II for a rehearing because they had heard no facts from Morale's side. See Defts.' Ex. 16 at 19, Art. 5.

Morale did appeal and was properly notified of the time, place and procedures. Pl's. Ex. 9 and 10. The appeal hearing before the Director took place on June 17, 1976. See Pl's. Ex. 1 at 10; Defts.' Ex. 16 at 19, Art. 4. There were many faculty members present, but few students. Morale was again represented by his legal counsel and had some witnesses, although none of his out-of-state witnesses were able to attend.

The hearing was essentially a trial de novo with Larrabee acting as the trier of fact. Morale and his counsel were allowed to call their own witnesses and to confront and cross-examine all witnesses. However, witnesses were carefully instructed by Larrabee that they need not answer any questions if they did not wish to do so, and were not sworn before they testified. Morale remained silent throughout the hearing. Although the atmosphere at the hearing was less than calm, I find that it was not as tumultuous as claimed by plaintiff. Grigel was, in his own words, "catty [and] facetious" while being questioned by Morale's lawyer. Dep. Grigel, Sept. 24, 1976, 2d Tr. at 10. The other witnesses were cooperative. While there was laughter at Larrabee's characterization of Grigel, the appeal hearing was neither riotous nor a farce.

Larrabee affirmed the decision of the Level II Committee. Pl's. Ex. 12. His decision was based upon the evidence adduced at both the Level II hearing and the appeal hearing, and the inference he drew from Morale's silence. He does not now and did not then entertain any doubt that Morale was in actual and knowing possession of marijuana seeds on the campus of NHTI.

---

5. It is clear that the Committee could not have found Morale guilty of possession of marijuana without his admissions because there never was any evidence before the Committee that the substance in the container was, in fact, marijuana. (However, for the purposes of this opinion, it is equally clear that these admissions were the product of the searches and, therefore, "fruit of the poisonous tree" under *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).)

## THE LAW

Plaintiff has raised two major issues in this case: first, whether or not the marijuana seized by Grigel and Lane was the product of an illegal search, and, if so, whether Morale's admissions should have been excluded from the disciplinary hearing as "fruit of the poisonous tree" under *Wong Sun, supra,* 371 U.S. 471, 83 S.Ct. 407; and, second, whether or not Morale was afforded process commensurate with the seriousness of the offense charged.

It is clearly established that students "do not 'shed their constitutional rights' at the schoolhouse door." *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975), quoting *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). *Accord, Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). I must determine, therefore, the extent of the protections and remedies provided by the Fourth and Fourteenth Amendments as they apply in this case.

### I.

The Fourth Amendment serves as a bulwark against governmental invasion of our privacy:

> The Fourth Amendment gives protection against unlawful searches and seizures, and . . . its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921).

It is apparent that the marijuana was seized as a result of official action. NHTI is a state institution, NH RSA ch. 188–A, and Lane is employed by it. Although the Institute's room check and search policies had not been written down prior to this litigation,[6] it is customary at NHTI that Head Residents are allowed to check rooms for health and safety reasons.[7] Grigel also was employed by NHTI. Although not paid in the usual manner, Grigel received compensation in the form of a credit toward his room and board costs for his services as Resident Assistant. Defts.' Ex. 16 at 5. He was not issued a pass key, but was given the responsibility of supervising the students in the dormitory and rendering any kind of assistance they needed. Defts.' Ex. 16 at 5, *Staff Responsibility*; Defts.' Ex. 16 at 8; Defts.' Ex. 16 at 19–20. I conclude that the searches as conducted by Lane and Grigel were governmental in nature.

Defendants claim that the searches conducted by Grigel alone were private searches. While I disagree with this conclusion, it is unnecessary in this case to delineate the boundary that divides private from official searches. I find that the searches conducted by Lane and Grigel were inextricably bound together and inevitably led to the seizure of the marijuana. On the first search, Grigel saw the ceiling tile askew, and the suspicion that was consequently aroused led Grigel, with Bart-

---

6. The only written policy statement concerning searches submitted to this court is contained in Defts.' Ex. 14 at 19, *State Board of Education Policies,* December 1, 1973, Student Rights § (D)(1).

D. *Investigation of Student Conduct*
  1. Except under extreme emergency circumstances, premises occupied by students and personal possessions of students should not be searched unless appropriate institute authorization has been obtained. In residence halls a responsible authority should be designated to whom application should be made before a search is conducted. The application should indicate why and what is being sought. If possible, the student should be present when the search is made. Lawful search requirements should be followed for premises not controlled by the institutes.

7. *See* Affidavit of Fillion, Larrabee and Lane, August 17, 1976.

lett's aid, to conduct the second Saturday night search. That search was, therefore, a direct result of the first Saturday search.

The Sunday searches are more tenuously connected, but I conclude that the Sunday search conducted by Grigel, Bartlett, Schneider, Winchester and Canning was prompted by Bartlett's revelation that he had seen a crumpled bag above the ceiling tiles. The group decided to search Morale's room precisely because they believed that the bag might contain some missing marijuana. It was on this Sunday search that Canning found the canister of marijuana seeds that was later seized by Grigel and Lane.

I conclude that these four searches, conducted under the auspices of Grigel's authority as an Assistant Resident, were inextricably bound together, one leading to the other; therefore, the taint of any one flows through the rest rendering the final seizure susceptible to censure for any prior Fourth Amendment violation. *Wong Sun v. United States, supra,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

█ The first search conducted by Lane and Grigel Saturday night violated Morale's Fourth Amendment right of "unmolested occupation of his dwelling." The search was motivated by Lane's and Grigel's keen desire to locate Joe Martin's stolen stereo. They were not looking for criminal evidence or even seeking to discipline the thief under school rules; they simply wanted to find the stereo. However, the fact that they were not searching for evidence of illegality does not automatically obviate the requirements of the Fourth Amendment, and the search must be reasonable to be constitutionally valid.

.  .  . [S]earches motivated by something other than the prospect of obtaining evidence of crime [are] subject to the general Fourth Amendment standard of reasonableness, and  .  .  . where the interest in making the search compete[s] with the privacy interest of the individual, the scope of the search [has] to be appropriately limited, in order to be con-

stitutionally permissible. *Picha v. Wielgos,* 410 F.Supp. 1214, 1220 (N.D.Ill.1976). *Accord, Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

█ In order to test the "reasonableness" of the search conducted by Grigel and Lane, I must balance "the need to search against the invasion which the search entails." *Camara, op. cit.* at 537, 87 S.Ct. at 1735. The invasion of privacy entailed in a room search, such as was done by Grigel, is obvious. A dormitory room is a student's home away from home, and any student may reasonably expect that once the door is closed to the outside, his or her solitude and secrecy will not be disturbed by a governmental intrusion without at least permission, if not invitation. The Fourth Amendment by its very terms guarantees this. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Piazzola v. Watkins,* 442 F.2d 284 (5th Cir. 1971); *Smyth v. Lubbers,* 398 F.Supp. 777, 786 (W.D.Mich. 1975); *Moore v. Student Affairs Committee of Troy State Univ.,* 284 F.Supp. 725 (M.D. Ala.1968); *City of Athens v. Wolf,* 38 Ohio St.2d 237, 313 N.E.2d 405 (1974); *People v. Cohen,* 57 Misc.2d 366, 292 N.Y.S.2d 706 (1968).

NHTI as part of New Hampshire's university system, has a primary interest in maintaining and promoting an educational atmosphere. While the school also has a "legitimate interest in preventing disruption on the campus," *Healy v. James, supra,* 408 U.S. at 184, 92 S.Ct. at 2348, its interests are limited by its function as an educational institution. A college cannot, in this day and age, protect students under the aegis of *in loco parentis* authority from the rigors of society's rules and laws, just as it cannot, under the same aegis, deprive students of their constitutional rights. *See Picha, supra,* 410 F.Supp. at 1220. Therefore, the legitimacy of the interests protected by any particular rule or regulation of NHTI must be measured against its functioning as a pedagogical institution.

True the University retains broad supervisory powers which permit it to adopt

the regulation heretofore quoted, provided that regulation is reasonably construed and is limited in its application to further the University's function as an educational institution. *Piazzola, supra,* 442 F.2d at 289.

*Accord, Smyth v. Lubbers, supra,* 398 F.Supp. at 788; *Moore, supra,* 284 F.Supp. at 729.

■ In this case, the school officials conducted a search of a student's dormitory room ostensibly looking for stolen goods. I need not address the issue of whether a search for illegal drugs is a reasonable exercise of a university's supervisory authority[8] because I find that a search for stolen property is not. Defendants have not convinced this court that NHTI has a clearly distinguishable and separate educational interest, nor one that is not already served by the penal statutes of this state.[9] The presence or absence of stealing on a campus does not disrupt or disturb the operation of its academic functions. The only interest to which the Institute could point to justify the search was to shelter its students from the criminal law enforcement authorities. Commendable or not, this is not an interest which justifies an infringement upon constitutional liberties.

■ In summary, I rule that a check or search of a student's dormitory room is unreasonable under the Fourth Amendment unless NHTI can show that the search furthers its functioning as an educational institution. The search must further an inter-

est that is separate and distinct from that served by New Hampshire's criminal law. Obviously, administrative checks of the rooms for health hazards are permissible pursuant to the school's interest in the maintenance of its plant and the health of its students, as are searches in emergencies, such as in the case of fire; however, intensive searches of rooms for stolen goods serve no legitimate interest of the Institute. I hold that the search conducted by Grigel and Lane on Saturday evening, May 24, 1976, was unreasonable, and because it was not conducted pursuant to a properly issued search warrant, the marijuana was illegally seized from Morale's dormitory room.

Defendants argue that, even if the search was illegal, it was a consensual one. I disagree. The state carries the burden of establishing consent and

[i]mplying consent to an otherwise unconstitutional search on the basis of the acts of a citizen would be appropriate only if those acts were unequivocal and specific. *Collier v. Miller,* 414 F.Supp. 1357, 1366 n. 9 (S.D.Tex.1976).

According to the Supreme Court:

if under all the circumstances it has appeared that the consent was not given voluntarily—that it was . . . granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable. *Schneckloth v. Bustamonte,* 412 U.S. 218, 233, 93 S.Ct. 2041, 2051, 36 L.Ed.2d 854 (1973).

---

8. I note, however, that defendants permit students of age to have alcohol on campus, and at least one court has held that:

. . . the College has not established that obedience to the drug laws and regulations is so crucial to the performance of its educational function that extraordinary means of enforcement must be allowed. Possession and use of alcohol are certainly no less foreign to education than possession and use of marijuana. *Smyth v. Lubbers, supra,* 398 F.Supp. at 790.

*Contra, Paine v. Board of Regents of University of Texas Sys.,* 355 F.Supp. 199, 204 (W.D.Tex. 1972), *aff'd,* 474 F.2d 1397 (5th Cir. 1973).

9. *See* Delgado, R., *College Searches and Seizures: Students, Privacy, and the Fourth*

*Amendment,* 26 Hastings L.J. 57 (1974). I note that the New Hampshire State Board of Education has already partially adopted this standard in its policies concerning student off-campus activities:

B.

\* \* \* \* \* \*

Where activities of students off-campus result in the violation of law and interrogation by investigators the institutes should:

\* \* \* \* \* \*

2. Not duplicate the function of general laws unless the institute's interests as an academic community are distinctly and clearly involved.

Defts.' Ex. 14 at 18, *State Board of Education Policies,* Student Rights § (B)(2).

In the instant case, Grigel and Lane acted under what they and the students believed to be lawful authority. Morale only opened the door and let them in. Even if he indicated acquiescence to the check, that cannot be construed by this court as consent to an otherwise unlawful search as it was neither unequivocal nor specific. Further, while *Schneckloth* rejected actual knowledge of one's Fourth Amendment rights as a required element of voluntariness, it is clear in the opinion that awareness of the right is preserved as one factor to be considered. The assumption by all actors in the Morale search that it was legitimate belies any knowledge on Morale's part of his right to refuse to allow it. In addition, Grigel testified that "it's almost a self-admission of guilt if you refuse entrance into your room." Dep. Grigel, Sept. 24, 1976, 1st Tr. at 19, 2d Tr. at 24. The color of authority, Morale's ignorance of his right to resist the search, and the clear indication that Morale's guilt would have been assumed by Grigel and Lane had he done so all lead this court to reject the State's claim of a consensual search.

I also reject the contention that the Student Resident Contract signed by Morale constitutes consent to otherwise unlawful searches and seizures. Defts.' Ex. 15. First, the contract indicates only that health and safety inspections will take place, which, if they entail a minimal intrusion and if they further a legitimate interest, would probably be reasonable. *See Camara v. Municipal Court, supra,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930; *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Colonnade Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). This court will not stretch Morale's contractual consent to minimal, reasonable room checks to include searches which violate his constitutional rights.

Second, even if the contractual provision which Morale signed includes extensive searches for stolen property, the school certainly cannot condition attendance at NHTI upon waiver of constitutional rights. *Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.2d 1628 (1943); *Piazzola, supra,* 442 F.2d 289–90; *Robinson v. Board of Regents of Eastern Kentucky University,* 475 F.2d 707 (6th Cir. 1973), *cert. denied,* 416 U.S. 982, 94 S.Ct. 2382, 40 L.Ed.2d 758 (1974); *Smyth v. Lubbers, supra,* 398 F.Supp. at 788. Therefore, I find that Morale did not consent to the Saturday search by Grigel and Lane; by the same analysis, I conclude that he did not consent to any of the other searches.

Morale gains little by this holding unless, as he urges, the exclusionary rule applies to a college disciplinary hearing. I first note that the exclusionary rule is not a "personal constitutional right" of United States residents; rather, it is merely a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). It is a rule not designed to compensate the victim of an illegal search for the invasion of his or her privacy, but fashioned only in an attempt to prevent future abuse.

> The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it. *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), as quoted in *Calandra, supra,* 414 U.S. at 347, 94 S.Ct. at 620.

The exclusionary rule was also originally adopted to ensure that "conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts . . . ." *Weeks v. United States,* 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). *Accord, Mapp v. Ohio,* 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The exclusionary rule was, in part, the Court's method of counteracting the implications of judicial acquiescence in the illegal activities of law enforcement officers. This consideration is not applicable in this case.

Morale urges this court to extend the application of the exclusionary rule in several respects. First, he seeks to avail himself of its benefits in a civil proceeding. However, the Supreme Court has never directly applied the exclusionary rule in a civil case. *United States v. Janis,* —— U.S. ——, ——, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976).[10] In the past, the Court has excluded illegally seized evidence in a quasi-criminal proceeding where the defendant was threatened with forfeiture of his car as a penalty for a criminal violation. *Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). The *Plymouth Sedan* holding rested upon the Court's determination that the forfeiture proceeding was, in essence, a criminal one.

> As, . . . suits for penalties and forfeitures incurred by the commission of offenses against the law, are of this quasi criminal nature, we think that they are within the reason of criminal proceedings for all the purposes of the Fourth Amendment of the Constitution. *Plymouth Sedan, supra,* 380 U.S. at 697–8, 85 S.Ct. at 1249, quoting *Boyd v. United States,* 116 U.S. 616, 634, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886).

In another early case, the Supreme Court also ruled that the Fourth Amendment served to protect a post-indictment grand jury witness from questions based upon illegally seized evidence. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The broad ruling of *Silverthorne* was that

> [t]he essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. *Op. cit.* at 392, 40 S.Ct. at 183.

Following the invitation of *Silverthorne* and *Plymouth Sedan* lower courts applied the exclusionary rule to civil proceedings.

See, e. g., *Pizzarello v. United States,* 408 F.2d 579 (2d Cir.), *cert. denied,* 396 U.S. 986, 90 S.Ct. 481, 24 L.Ed.2d 450 (1969); *Rogers v. United States,* 97 F.2d 691 (1st Cir. 1938) (customs and tax assessments); *Knoll Associates, Inc. v. F. T. C.,* 397 F.2d 530 (7th Cir. 1968) (Federal Trade Commission hearing); *Verdugo v. United States,* 402 F.2d 599 (9th Cir. 1968), *cert. denied,* 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1970) and 402 U.S. 961 (1971) (sentencing hearing). While not overruled, these cases have been severely undermined by recent Supreme Court decisions upholding a tax assessment based upon illegally seized evidence, *Janis, supra,* —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d 1046, and allowing the Government to propound questions based upon illegally seized evidence to a grand jury witness, *Calandra, supra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561. *See United States v. Vandemark,* 522 F.2d 1019 (9th Cir. 1975), explaining *Verdugo, supra,* 402 F.2d 599.

■ Second, Morale argues that the exclusionary rule should apply in the school disciplinary hearing despite the fact that he has never been charged with a criminal offense as a result of the illegal seizure. However, the Supreme Court has specifically limited the applicability of the exclusionary rule to criminal defendants.

> . . . [I]n the instant case respondent had not been indicted by the grand jury and was not a criminal defendant. Under traditional principles, he had no standing to invoke the exclusionary rule. *United States v. Calandra, supra,* 414 U.S. at 352 n. 8, 94 S.Ct. at 622.

While this language is dicta, the intent of the Supreme Court is plain. It is further bolstered by the fact that in most, if not in all, Supreme Court exclusionary rule cases, the victim of the illegal search had been a criminal defendant at one stage or another due to the search.[11] The *Calandra* dicta,

---

10. Plaintiff cites *Bilokumsky v. Tod,* 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), for the proposition that illegally seized evidence may not be used in a deportation proceeding; however, the Court did not reach the question of whether the Fourth Amendment bars illegally

seized evidence from such hearings. *See op. cit.* at 155, 44 S.Ct. 54.

11. *Compare, Janis, supra,* —— U.S. at ——, 96 S.Ct. 3021 *with Air Pollution Variance Bd. v. Western Alfalfa,* 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974).

coupled with the Court's refusal to extend the exclusionary rule to a civil proceeding in *Janis,* albeit upon a rationale which is inapplicable in the instant case, leads this court to conclude that the exclusionary rule is a remedy which is unavailable to Morale. The Supreme Court clearly intends to limit the exclusionary rule to criminal proceedings and to allow only a criminal defendant to invoke its protections. *Contra Smyth v. Lubbers, supra,* 398 F.Supp. at 794; *Caldwell v. Cannady,* 340 F.Supp. 835, 839 (N.D. Tex.1972).

Finally, I am unconvinced that such a drastic measure as the exclusionary rule is really necessary here. In light of the rationale for the rule, I may not consider the harm suffered by Morale from the illegal search in determining whether or not to apply it. I may look only to whether defendants' violation of the Fourth Amendment rights of Morale and all NHTI students has been so flagrant and consistent as to call for the exclusion of evidence seized by school officials at the Institute's disciplinary hearings. *United States v. Winsett,* 518 F.2d 51 (9th Cir. 1975). The parameters of Fourth Amendment protections on campus have been unclear. *Compare, Keene v. Rodgers,* 316 F.Supp. 217 (D.Me.1970), *with Smyth v. Lubbers, supra,* 398 F.Supp. 777. I must assume that, in the future, defendants will respect the students' Fourth Amendment rights as delineated in this opinion; therefore, I find no need to invoke a remedy which would have such a drastic effect upon the power of defendants to deal with a student who has failed to comply with NHTI's rules and regulations.

█ I realize that this holding may leave Morale basically without a remedy for the wrong that he has suffered. A school official is liable, under 42 U.S.C. § 1983, to a wronged student only if

he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. *Wood v. Strickland, supra,* 420 U.S. at 322, 95 S.Ct. at 1001.

The damages remedy of *Bivens v. Six Unknown Fed. Narcotic Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), has been limited in its applicability to federal officials. *Rodriguez v. Ritchey,* 539 F.2d 394 (5th Cir. 1976); *Brubaker v. King,* 505 F.2d 534 (7th Cir. 1974). Further, in both *Rodriguez* and *Brubaker,* the good faith defense available to law enforcement officials under 42 U.S.C. § 1983, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), was held available to federal agents sued under the *Bivens* theory. This raises the issue of whether or not the good faith defense of *Wood v. Strickland* would be applicable in this case, even if defendants were amenable to suit under a *Bivens* theory. In light of these recent developments in the law, I must conclude that the Supreme Court has intentionally left students basically remediless in the federal courts for violation of their Fourth Amendment rights.

## II.

Morale next complains that his right to due process of law under the Fourteenth Amendment was violated before and during the May 26 and June 17 hearings. He claims that he had a right to remain silent, to notice of the charges and the names of his accusers, to have adequate time and opportunity to prepare his defense, to be represented by legal counsel, to make a record of all proceedings, to be tried by an impartial trier of fact in an open hearing, to confront and cross-examine any witnesses against him, to have the decision based solely upon legal evidence adduced before the trier of fact, to have a written decision with findings of fact and reasons underlying the findings and punishment, and finally, to appeal to an impartial appeal judge.

█ The Supreme Court has addressed itself twice to the issue of due process in

**1002**

school disciplinary hearings. Morale has a constitutional right not to be deprived of his educational opportunities at NHTI by reason of violating NHTI's rules and regulations without due process of law. *Wood v. Strickland, supra,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214; *Goss v. Lopez, supra,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725. *See* NH RSA 188–A:1; NH RSA 188–A:3 (Supp.1975).

> . . . [T]he total exclusion from the educational process for more than a trivial period . . . is a serious event in the life of the suspended child. Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses. *Goss, supra,* 419 U.S. at 576, 95 S.Ct. at 737.

The only question is what process is due a university student charged with possession of marijuana and facing a long-term suspension or expulsion. *Goss* concerned high school students suspended for ten days, while, in this case, the punishment was, in fact, much more severe. The NHTI administrators knew at the time of Morale's hearing that the punishment would be either long-term suspension or expulsion. *See* Defts.' Ex. 14 at 25. Therefore, the procedures outlined in *Goss* as constitutionally requisite, notice and an opportunity to explain and present evidence, may not be sufficient in this case.

> Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required. *Goss, supra,* 419 U.S. at 584, 95 S.Ct. at 741.

This court has already addressed the issue of what process is due in a school disciplinary hearing. *Vail v. Board of Education of Portsmouth School Dist.,* 354 F.Supp. 592, 603–4 (D.N.H.1973), *aff'd in part,* 502 F.2d 1159. In that case, I held that:

> [W]hen punishment by a lengthy suspension is to be imposed . . . the constitutional right to due process requires written specification of charges, notice, and a full prior hearing.
>
> \* \* \* \* \* \*
>
> 1. The accused student and at least one of his parents or his guardian shall be furnished, either in person or by mail directed to the student's last known address, [a letter] with written notice of the charges and of the nature of the evidence against the accused student.
> 2. The accused student and at least one of his parents or his guardian shall be offered a formal hearing after sufficient time to prepare a defense or reply, at which hearing evidence in support of the charge shall be presented by school officials and the accused student or his parent or guardian shall have ample opportunity to present any defense or reply.
> 3. The decision of school officials to impose such discipline shall be based upon a dispassionate and fair consideration of substantial evidence that the accused student committed the acts for which suspension is to be imposed and that such acts are in fact a proper reason for such suspension.

It is against this standard of due process that I must measure the process received by Morale. In doing so, I am aware of the admonition of the Supreme Court that:

> Given the fact that there *was* evidence supporting the charge against respondents, the contrary judgment of the Court of Appeals is improvident. It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. \* \* \* But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of

public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees. * * * *Wood, supra,* 420 U.S. at 326, 95 S.Ct. at 1003. (Emphasis in original.) (Citations omitted.)

■ Morale's first claim is that he was effectively denied his right to remain silent because of the inference made by Larrabee from that silence. However, under the rule of *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), this was an inference that could legitimately be drawn in these circumstances.[12] Morale was not and is not a criminal defendant, and the State has not "sought to make evidentiary use of his silence at the disciplinary hearing in any criminal proceeding." *Op. cit.,* 425 U.S. at 317, 96 S.Ct. at 1557. Further, "as far as this record reveals, his silence was given no more evidentiary value than was warranted by the facts surrounding his case." *Op. cit.,* 425 U.S. at 318, 96 S.Ct. at 1557. I rule, therefore, that Larrabee's reliance upon Morale's silence as one factor pointing towards a guilty finding did not violate Morale's rights under the Fifth or Fourteenth Amendments to remain silent or to due process of law.

■ It is undisputed that Morale had a right to written notice of the charges against him and to an opportunity and adequate time to prepare his defense. *Vail, supra,* 354 F.Supp. at 603. I find, as a matter of fact, that he had both. Downs attempted to give Morale a written disciplinary notice which contained an adequate description of the charge and names of his accusers. Morale's refusal to accept the

written notice cannot serve as the basis of a constitutional claim against the school. The *Vail* requirement of written notice to a parent or guardian is obviated in this case because Morale is not a minor. Morale appeared Wednesday with witnesses to testify on his behalf and legal counsel to defend him. Despite Larrabee's ban, he had returned to the NHTI campus to get his witnesses and to prepare his defense. I find that he did in fact have time and an opportunity to prepare the presentation of his case.

Morale claims a Fourteenth Amendment right to legal counsel in a school disciplinary hearing. Because he was, in fact, represented by counsel, I need not decide whether he was constitutionally entitled to one.

■ He next claims the rights to make a record of the proceedings and to be tried by an impartial trier-of-fact in an open hearing. I find, as a matter of fact, that the Level II Committee was impartial. Downs carefully left the meeting at Larrabee's office so that he would not be swayed by what he might hear. Further, there is no evidence of any prejudice for or against Morale on the part of the Committee.

■ In determining whether a record is mandated under the due process clause, I must balance Morale's interests as against those of NHTI. Morale's interest in a record depends upon his right to appeal the decision. His right to bring witnesses and to present evidence would amount to little if, upon appeal, there were no way to bring forward his facts. However, Morale's appeal to Larrabee took the form of a trial *de novo* ; therefore, there was no error in this case.

■ NHTI's error, if any, in failing to provide Morale with an open hearing was

---

**12.** *See Bilokumsky v. Tod, supra,* 263 U.S. at 153–54, 44 S.Ct. at 56:

Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character. . . .

Conduct is often capable of several interpretations; and caution should be exercised in drawing inferences from it. But there is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak. Deportation proceedings are civil in their nature. (Citations omitted.)

likewise cured by the open trial *de novo* appeal. Morale refused to partake in the first hearing and was, therefore, not harmed by its secrecy. Whether or not an open hearing is constitutionally mandated is an issue which I need not resolve in this case, but I do note that for cases which attract schoolwide attention, open hearings would avoid, at a minimum, the appearance of arbitrary decision-making violative of the Fourteenth Amendment.

I need not consider Morale's claim of a right to confront and cross-examine the witnesses against him because he was given the opportunity to do so.

■ Morale claims a constitutional right to have the decision based solely upon evidence presented at the hearing. While Larrabee did testify that he considered the admissions made by Morale to him before the June 17 hearing, there was independent testimony before Larrabee that Morale had admitted possession to others on separate occasions. Lane's and Morrisette's testimony alone constituted "substantial evidence that the accused student committed the acts for which suspension is to be imposed." *Vail, supra,* 354 F.Supp. at 603–4. If Larrabee made an error in considering what he had heard outside the hearing, it was harmless.

■ Morale was clearly entitled to know of the decision of the Level II Committee, and he was so informed in writing after both hearings. Pl's. Ex. 7, 8; Defts.' Ex. 12. However, the Level II Committee did not inform Morale of the " 'evidence relied on and reasons' for the disciplinary action." *Wolff v. McDonnell,* 418 U.S. 539, 564, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974), quoting *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Because of the severity of the punishment and because such a requirement poses no burden upon the school's interest in quick and effective discipline, I hold that written reasons are constitutionally mandated. However, Larrabee clearly outlined the reasons for his decision, thus informing Morale of the grounds for his suspension. There is no evidence that Morale suffered from the failure of the Level II Committee to explain their holding. There was no reversible error.

■ Finally, Morale claims a right to appeal to an impartial appeals judge. Certainly, it would be preferable if a person completely uninvolved in the events precipitating a disciplinary hearing and appeal were available as an appeals judge, but such is not the command of the Fourteenth Amendment. The requirements of an impartial hearer is to prevent the "hazard of arbitrary decisionmaking," *Wolff, supra,* 418 U.S. at 571, 94 S.Ct. 2963, and I find no evidence on this record that establishes "arbitrary decisionmaking." Although Larrabee indicated in his June 4 letter to Morale, Pl's. Ex. 10 at 2, that he "would not overturn the decision and remand the matter for a new hearing," he adequately explained this statement to the court. The language of the letter apes the language of Morale's counsel, Pl's. Ex. 9, and I find that Larrabee did not intend to blindly adhere to the Level II Committee's holding were it unsupported by the evidence Larrabee heard. There was, therefore, no real hazard of an arbitrary decision.

In summary, I find no violation of plaintiff's right to due process of law under the Fourteenth Amendment. I remind plaintiff of Justice Brandeis' words:

> . . ., a hearing granted does not cease to be fair, merely because rules of evidence and of procedure applicable in judicial proceedings have not been strictly followed . . . or because some evidence has been improperly rejected or received. * * * To render a hearing unfair the defect, or the practice complained of, must have been such as might have led to a denial of justice, or there must have been absent one of the elements deemed essential to due process. (Citations omitted.) *Bilokumsky v. Tod, supra,* 263 U.S. at 157, 44 S.Ct. at 57.

In deciding this case, I have questioned the wisdom of almost every actor in this entire drama. However, as the Supreme Court noted, federal courts do not sit in

judgment of the wisdom of school administrators, students or even attorneys. There was ample evidence supporting the charge against Morale, and I find no constitutional basis upon which a federal court can correct the errors of judgment by all so starkly apparent in the record.

In light of this opinion, all outstanding motions are moot and are, therefore, dismissed.

Judgment for defendants. No costs.

SO ORDERED.