**UNITED STATES of America, Appellee,**

v.

**John MILLER, Defendant, Appellant.**

**No. 80–1207.**

United States Court of Appeals, First Circuit.

Argued Oct. 7, 1980.

Decided Nov. 21, 1980.

---

Leo S. McNamara, Boston, Mass., with whom Davey & Davey, Boston, Mass., was on brief, for defendant, appellant.

Kevin J. O'Dea, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, and ALDRICH and BOWNES, Circuit Judges.

PER CURIAM.

John Miller appeals from a jury verdict convicting him of fraudulently smuggling, receiving, and facilitating the transportation of swordfish from Canada into the United States. He argues that his indictment failed to inform him adequately of the charges against him, that the district court erred in refusing to suppress the search and seizure of the fish, and that there was insufficient evidence to support his conviction. We affirm.

[The only discussion meriting publication is the second issue concerning the validity of the search and seizure. For an understanding of this discussion, we include our review of the evidence.]

I.

The evidence taken in the light most favorable to the prosecution, *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir. 1978), reveals the following. Appellant Miller was president and owner of Nova Seafoods, Inc., of Yarmouth, Nova Scotia, Canada. In the summer of 1978, Miller legitimately attempted to import a truckload of swordfish from Canada to Massachusetts. He complied with Customs and Federal Drug Administration inspection procedures, but was informed that his fish could not enter the United States since its mercury content exceeded federal standards.

Another swordfish importation, occurring over the three days from Saturday, September 29, 1979 through Monday, October 1, 1979, comprised the focus of this suit. On Saturday evening in Carlton, Nova Scotia, Miller met with Richard Ottino, whom he knew to be a cousin of an associate. Miller mentioned to Ottino that he was smuggling swordfish into the United States. He recounted the profitable nature of the enterprise and explained that he had no problem bringing fish in through Maine because of his contacts there. He informed Ottino that federal authorities had confiscated a shipment of his fish the week before. Miller left this meeting in Carlton to catch a ferry bound for St. John, New Brunswick, which is adjacent to Maine. Unbeknownst to Miller, Ottino in fact was Police Commissioner of the town of Kingston, Massachusetts. Ottino related the substance of his conversation to Special Agent Callahan of the United States Customs Service when Ottino returned to the United States.

On Saturday morning at 3:00 a. m., a truck bearing Canadian registration arrived at United States Customs in Calais, Main. The driver—one Arthur M. Ross-produced an invoice stating that he was carrying 48,000 pounds of duty free frozen herring

bait. The invoice identified F. H. Fenderson, Inc. as the customs broker, Sum Good Stores of Yarmouth, Nova Scotia as the shipper, and Wally's Sea Products Corp. of Boston as the consignee of the cargo. The driver valued the herring at about $12,000. The Customs inspector on duty instructed the driver to open several boxes on top of the four foot deep load in the truck's trailer. The inspector released the cargo when he discovered all these boxes to contain herring.

About sixteen hours later, around 7:00 p. m. Sunday evening, Officer Stevens of the Weymouth, Massachusetts Police responded to an anonymous tip to go to the Capitol Supermarket. As he drove up to the rear of the supermarket, Stevens saw the trailer portion of a tractor trailer unit backed up to a U-Haul truck. Stevens then saw a man whom he later identified as Miller flee from the truck to a nearby wooded area. After attempting to pursue him, Stevens gave up and returned to the trucks. There he observed four persons transferring swordfish from the trailer to the U-Haul truck. The trailer had no license plates. Stevens inquired about the trailer's driver and the ownership of the fish. The four men directed him to look for the driver, Art Mead, in Room 24 of the Boston Motel in Weymouth. Stevens went to the Boston Motel but discovered that Room 24 was registered to Miller, not Art Mead. After failing to find Mead, Stevens returned to the Capitol Supermarket to discover that the trucks were gone. He then proceeded to the Capeway Fish market (which was owned by Walter Wojtasinski, Jr., one of the four persons he had observed at the Capitol Supermarket) and observed two U-Haul trucks parked there. One he recognized from the Capitol parking lot. He saw the same four men, and again inquired as to the origin and ownership of the fish. He received no answer. Stevens returned to the police station, but about 11:00 p. m. that same evening returned to the Capeway Fish Market. There he met Miller, whom he identified from the Capitol parking lot. Miller stated that he was the owner of the fish, which had come from Canada. Miller

told Stevens that he did not have a bill of lading for the fish, but that he would get one to Stevens within a day or two.

At 11:30 p. m. that Sunday night, the Weymouth Police called Vincent Freitas, the Weymouth health inspector, to inform him that a large quantity of fish was being transferred to the Capeway Fish Market. Freitas directed that the fish be embargoed because he "was concerned about the wholesomeness of the fish." As a result, Officer Stevens was dispatched back to the Capeway market, where he prevented Wojtasinski from moving the U-Hauls from the premises to Boston at about 5:00 or 5:30 a. m. that Monday morning.

About this time (the precise time being uncertain), Weymouth health inspector Freitas arrived at the Capeway Market. The U-Hauls containing the fish were locked, but an unidentified Capeway employee unlocked the trucks at Freitas's request. Freitas examined the fish and again announced that they were to be embargoed pending laboratory inspection. Freitas gave to Wojtasinski the stub of the embargo slip, which noted "question on import" as the reason for the embargo.

Sometime later, at about 6:30 or 7:30 a. m., Stevens and another officer returned to Room 24 of the Boston Motel. There they saw Miller, and they again asked him about the origin and ownership of the fish. Miller again stated that the fish were from Canada, and gave them a bill of lading that he had written out the previous evening after leaving the Capeway Fish Market. This bill showed Sum Good Stores, Ltd. to be the fish's carrier and "Capeway Fish" to be the consignee. Miller told Stevens that Sum Good Stores owned the fish, but that *he* had had "to sign over the property" to the independent truck driver to fulfill the requirement that the independent driver carry only his own property. In response to Stevens's questions, Miller indicated that he had neither brought the fish through customs nor had it inspected. Neither had he paid import tariffs on it. Stevens then announced to him that the swordfish had been embargoed. After Stevens asked Miller if he

would return to the Capeway Market, Miller requested to ride there with the police.

Later that morning the U-Haul trucks were again opened at Freitas's request with keys provided by a Capeway employee. U. S. Customs Special Agent Callahan—the agent to whom Ottino related his Nova Scotia conversation with Miller—arrived, investigated the situation, and seized the 40,000 pounds of swordfish, which Miller valued at about $80,000. He also arrested Miller. Subsequent analysis by the FDA showed that the swordfish had a mercury content 20 percent in excess of the FDA's maximum regulation.

The next day, Tuesday, October 2, 1979, Callahan presented to a United States magistrate an affidavit charging illegal importation. On October 15, 1979, the magistrate found the complaint to be supported by probable cause, and Miller subsequently was indicted. Before trial, Miller moved to suppress the evidence of the swordfish. After a hearing, this motion was denied.

At trial, the government presented evidence of the recited facts. It also called a Mr. Weston, customs broker for F. M. Fenderson, Inc. Mr. Weston explained that all merchandise worth more than $250 has to be legally entered through a customs broker, who takes care of "all the paperwork for customs, explaining what came through the border, what it was valued at, [and] who it was going to." He explained that one of Fenderson's accounts is Sum Good Stores of Yarmouth, Nova Scotia. He presented a computer printout of accounts receivable for one month of service to Sum Good, which showed five entries adding up to $61.25 in service charges to Sum Good. One of these entries, for $22.25, was explained in detail on another sheet presented into evidence. This sheet indicated that these fees were due for Fenderson's services for a truck carrying 48,000 pounds of duty free frozen bait herring from Sum Good in Canada that passed through Customs in Calais, Maine on September 30, 1979 bound for Wally's Sea Products in Boston. Mr. Weston further stated that Sum Good had paid the $61.25 bill with a check imprinted with

Sum Good's name and signed by John Miller. Submitted into evidence along with the check was a portion of the envelope that had contained the check, showing the return address of Nova Recreation and Development Company, Limited, Yarmouth, Nova Scotia.

The jury found Miller guilty on both counts.

\* \* \* \* \* \*

### III.

Miller's second contention is that the government's warrantless seizure and search of the swordfish violated the Fourth Amendment. The government first responds that Miller had no reasonable expectation of privacy in the fish. Miller replies that the government is barred from pursuing this issue before this court since it did not present the question to the district court. He cites, *inter alia, Giordenello v. United States*, 357 U.S. 480, 488, 78 S.Ct. 1245, 1251, 2 L.Ed.2d 1503 (1958) and *United States v. Emery*, 541 F.2d 887, 889 n.3 (1st Cir. 1976).

It is indeed the ordinary rule that "an appellate court does not give consideration to issues not raised below", since it would be unfair if litigants were "surprised on appeal by final decision there of issues upon which they ha[d] no opportunity to introduce evidence." *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). But "[t]here may always be exceptional cases or particular circumstances which prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed nor passed upon by the court ... below." *Id.* at 557, 61 S.Ct. at 721. In light of *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) —which was law when this case was tried— this case presents "particular circumstances" justifying consideration of whether Miller has standing to pursue his Fourth Amendment claim. *Rakas* stated that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by

the challenged search or seizure." 439 U.S. at 131 n. 1, 99 S.Ct. at 423 n.1. It also established that the "Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many ... traditional standing inquiries and ... that definition of those rights is more. properly placed within the purview of substantive Fourth Amendment law than that of standing." *Id.* at 140, 99 S.Ct. at 428. Miller thus cannot complain that he is "surprised on appeal by final decision [here] of issues upon which [he has] had no opportunity to introduce evidence." *Hormel,* 312 U.S. at 556, 61 S.Ct. at 721. Miller had the burden of establishing the scope of his personal Fourth Amendment rights. The failure to raise that standing issue was his failure, not the government's. *See also Rawlings v. Kentucky,* ── U.S. ──, ──, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (June 25, 1980); *United States v. Goshorn,* 628 F.2d 697 (1st Cir. 1980). We therefore disapprove any contrary suggestion in *United States v. Emery,* 541 F.2d at 889 n.3, and entertain the government's argument that Miller cannot show that a Fourth Amendment privacy interest personal to him was invaded when the government seized and inspected the fish. This holding is limited, of course, to rulings of law, as distinguished from disturbing district court findings at the instance of one who has not appealed.

 Miller asserts that his "claim of ownership of the fish fulfilled any standing prerequisite which was pertinent." Even assuming that Miller indeed owned the fish, we note that "[o]wnership alone is not enough to establish a reasonable and legitimate expectation of privacy." *United States v. Dall,* 608 F.2d 910, 914 (1st Cir. 1979), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980). *See also Rawlings, supra,* 100 S.Ct. at 2561–62. Focusing instead on the "total circumstances", 608 F.2d at 914, we think it clear that Miller had no expectation of privacy in the fish or their container at the time of seizure and search. When Officer Stevens first responded to the anonymous tip, he observed Miller flee into the woods from behind the

Capitol Supermarket. Miller left behind the open trailer that he had hired, from which four men were unloading the fish into an open U-Haul truck that had been rented by Walter Wojtasinski, Jr. The facts do not establish that the four men were in any special relationship of confidence with Miller, or that they worked under some limited grant of his permission. The facts do suggest that Miller was the driver of neither the trailer that he had rented nor of both Wojtasinski's U-Haul trucks. After the fish had been transferred at the Capitol Supermarket, they were driven to the Capeway Fish Market—a store owned by Walter Wojtasinski, Jr. They were stored on Wojtasinski's premises, in Wojtasinski's trucks, until 5:00 or 5:30 the next morning. Then Wojtasinski—in Miller's absence—attempted to have them shipped to Wally's Sea Products of Boston, an enterprise owned by Walter Wojtasinski, Sr., Wojtasinski's father. The fish were being shipped to Wally's Sea Products of Boston, an enterprise owned by Walter Wojtasinski, Sr.

Miller thus behaved as if he had no remaining control over or interest in the fish. Before this court Miller points to no conduct of his that manifests any association with the U-Haul trucks or with the fish that implicates Fourth Amendment protection. "In a word, appellant failed to sustain the burden of proving that he had a legitimate expectation of privacy in" the property that was the setting for the asserted constitutional violation. *United States v. Dall, supra,* 608 F.2d at 915. We therefore reject Miller's Fourth Amendment claim.

\* \* \* \* \* \*

*Affirmed.*