UNITED STATES of America, Appellee,

v.

Juan Guilbe IRIZARRY and Jose Garcia Rodriguez, Defendants, Appellants.

No. 80–1463.

United States Court of Appeals, First Circuit.

Heard Sept. 9, 1981.

Decided March 19, 1982.

Rehearing and Rehearing En Banc Denied May 11, 1982.

David W. Roman, San Juan, P. R., for defendants, appellants.

H. Manuel Hernandez, Asst. U. S. Atty., Hato Rey, P. R., with whom Raymond L. Acosta, U. S. Atty., San Juan, P. R., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and BREYER, Circuit Judges.

COFFIN, Chief Judge.

This case poses a Fourth Amendment challenge to the validity of a warrantless search and seizure by federal agents in Puerto Rico. One defendant also raises the further question of whether his motion for a verdict of acquittal was properly denied. Our review of the record persuades us that the trial court should have suppressed some of the challenged evidence, and that one of the convictions should therefore be reversed.

## I. The Facts

During the late evening and early morning of January 28–29, 1980, the United States Drug Enforcement Administration's Puerto Rican office coordinated four or five

arrest teams as they effected about twenty-three different arrests for federal drug violations. One of those teams was led by DEA Special Agent Swint. Agent Swint's team included a second DEA agent, two FBI agents, and two local police officers. Shortly after midnight Agent Swint learned via radio that Osvaldo Farinas, for whom his team had an arrest warrant, was in a room at the Isla Verde Holiday Inn. The agents parked their cars near the hotel security guard post and walked up to the room.

Agent Swint knocked on the door to the room and called, "Police. Open the door." The room had a plate-glass window next to the door, and the curtain on the window was drawn back about one foot. Agent Swint looked through the window and saw appellant Guilbe withdraw a revolver from a handbag that was resting on the dresser. Agent Swint took cover. Two to three minutes later he called out, "Police, open the door. Come out with your hands up." Three to four minutes later, the door opened and Guilbe emerged with his hands up, followed by appellant Garcia and Farinas. All three were arrested in the hallway, were ordered to lie on the floor, were searched for weapons, and were advised of their rights in Spanish.

Agent Swint then entered the hotel room "to see if there were any other persons inside the room." He went through the main room and entered the bathroom, where he noticed marijuana residue around the sides and the bottom of the bathtub. He returned to the main room and observed two marijuana cigarette butts in the ashtray. Agent Swint told the rest of the agents that there was no one else on the premises, got a bag, and went back to the bathroom to collect the residue from the tub. The three defendants were then taken back into the hotel room.

FBI Agent Philip remained in the hallway for a few minutes. He then entered the room "to see what was happening or what was keeping Special Agent Swint." He walked straight into the bathroom and saw Agent Swint standing inside the bathtub. He looked up at the bathroom's drop ceiling and saw that a soundproofing panel in the ceiling was ajar. He climbed up onto the toilet, looked into the space in the ceiling and saw an object. He reached into the ceiling and removed the object, which turned out to be a package of marijuana and a gun. He then asked for a flashlight, looked in again, and found four packages: two more guns, a package of cocaine, and a second package of marijuana.

Before trial, the defendants moved on the basis of stipulated facts to suppress all evidence found in the hotel room and bathroom. The trial court denied the motions. At a bench trial, the defendants objected to the use of the seized evidence, on the basis of the agents' live testimony. The trial court overruled the objections and found all three defendants guilty of having aided and abetted each other in possessing a measurable quantity of marijuana and in possessing cocaine with intent to distribute it. 18 U.S.C. § 2, 21 U.S.C. §§ 841(a)(1), 844. The court also found defendant Guilbe guilty of possession of a firearm while aiding and abetting the others in their possession with intent to distribute cocaine, 18 U.S.C. § 924(c)(2). Guilbe and Garcia took these appeals. Farinas chose not to rely on the courts and took off.

## II. The Fourth Amendment Challenges

### A. *Standing of Appellant Garcia*

In order to challenge on Fourth Amendment grounds the use of evidence at one's trial, one must demonstrate "a legitimate expectation of privacy in the area searched". *United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980). The hotel room here was registered to appellant Guilbe. Appellant Garcia, however, offered no evidence of any personal interest in the room beyond his being "merely present". Indeed, he affirmatively sought to deny any connection with the room or its contents. It was therefore perfectly legitimate to introduce evidence seized from the room against him at trial.

We realize that the government did not challenge Garcia's standing, either before

the trial court or on appeal. That fact, however, does not alone bring us within the rule of *Steagald v. United States,* 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1645–47, 68 L.Ed.2d 38 (1981), in which a defendant's standing was held to be beyond further challenge. In *Steagald* the government failed to challenge facts from which the defendant's standing could reasonably have been inferred. In this case, Garcia never carried his initial burden of offering facts from which a court might reasonably infer his standing. *See United States v. Miller,* 636 F.2d 850, 853–54 (1st Cir. 1980). Moreover, in *Steagald* the government appeared to have raised the standing issue as part of a last-minute shift in litigation tactics. In this case, there is nothing to suggest that the government was deliberately "sandbagging" the district court or shifting strategies.

In the discussion that follows, we consider only whether appellant Guilbe was denied a fair trial by the admission of the seized evidence.

### B. *Legitimacy of the Agents' Activities*

Since the search of the hotel room followed immediately upon the arrest of the defendants, one might be tempted to analyze it as a search "incident to an arrest", undertaken to preserve the officers' safety and prevent the destruction of evidence. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). We therefore note explicitly that the government does not invoke the *Chimel* exception here, because none of the items seized was within the "immediate control" of the defendants at the time of their arrest in the hallway. *Id.* at 763, 89 S.Ct. at 2040.

Instead, the government offers a two-step justification for the seizures by Agents Swint and Philip. It argues that Agent Swint was entitled to enter and briefly examine the hotel room because of "exigent circumstances" and that he was then entitled to seize evidence under the "plain view" doctrine. Similarly, the government argues that Agent Philip legitimately entered the bathroom and that the evidence

above the bathroom ceiling was in plain view. We analyze these arguments one step at a time.

1. Exigent Circumstances—Swint's Entry

In *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971), the Supreme Court summarized the law of warrantless searches as follows:

> "Thus the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions'. The exceptions are 'jealously and carefully drawn', and there must be 'a showing by those who seek exemption ... that the exigencies of the situation made that course imperative'. '[T]he burden is on those seeking the exemption to show the need for it.' "

This doctrine is often expressed in the shorthand phrase, "warrantless searches are *per se* unreasonable in the absence of exigent circumstances". *Id.* at 479, 91 S.Ct. at 2044.

"Exigent circumstances" have traditionally been found in those crisis situations when there is compelling need for official action and no time to secure a warrant. *Michigan v. Tyler,* 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (warrantless entry into a burning building to put out a blaze). *See also Chimel v. California, supra* (search "incident to arrest"); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (warrantless entry in hot pursuit of an armed robber); *Ker v. California,* 374 U.S. 23, 40–43, 83 S.Ct. 1623, 1633–1635, 10 L.Ed.2d 726 (1963) (warrantless entry to prevent destruction of evidence where such destruction is reasonably thought imminent); *United States v. Zurosky,* 614 F.2d 779 (1st Cir. 1979) (warrantless entry into warehouse at 4:25 a.m. when activity inside reasonably suggests that a breaking and entering is taking

place); *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir. 1979) (warrantless entry to prevent destruction of heroin reasonably thought imminent); *United States v. Miller*, 589 F.2d 1117, 1126 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (warrantless entry and reentry of a boat where drowning suspected and tidal flow created need for swift action).

■ In this case, we agree that the government has carried its burden of demonstrating a "compelling need" for Officer Swint to enter the hotel room and perform a post-arrest "security check", in order to determine whether another, potentially armed, individual was hiding within the room. The record on this point is somewhat spare and makes it a close issue. Nevertheless, we believe that it adequately demonstrates that Agent Swint's search was not motivated by mere curiosity, but rather by a legitimate concern for the safety of his fellow officers. It was late at night. They had come to the hotel to arrest one person. Three people had emerged from the room after a five-to-seven minute delay. Most significantly, one of the three had produced a gun inside the room. Agent Swint was entirely reasonable in suspecting that a fourth person, also armed, remained within. *Compare United States v. Gamble*, 473 F.2d 1274 (7th Cir. 1973). His entry was necessary to ensure that the potential fourth person did not attempt to surprise the agents in the hallway and thereby secure the escape of the other three. Agent Swint obviously could not have sought a warrant to perform such a security check. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden, supra*, 387 U.S. at 298–99, 87 S.Ct. at 1645–46. *See also* W. LaFave, *Search and Seizure* § 6.4, at 431 (1978 & Supp.1981) and cases discussed therein.

■ Having established Agent Swint's right to enter the hotel room we must also establish that the scope and manner of his search were "strictly circumscribed by the exigencies which justify its initiation". *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978); *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882–1883, 20 L.Ed.2d 889 (1968). Agent Swint entered the living room and walked into the bathroom. Nothing in the record suggests that his search ever deviated from a path corresponding to an objectively reasonable hunt for an armed fourth person. His search was thus in proper proportion to the exigency that authorized it; it was not unreasonable under the Fourth Amendment.

### 2. The "Plain View" Doctrine—Swint's Seizures

■ While carrying out his security check of the bathroom and hotel room, Agent Swint observed marijuana residue in the bathroom and marijuana butts in the living room ashtray. After completing his security check, Agent Swint seized those items. In *Coolidge, supra*, the plurality opinion stated that where a police officer has a prior legitimate justification for an intrusion, in the course of which he inadvertently comes across a piece of incriminating evidence, he may seize that evidence without a warrant. 403 U.S. at 466–70, 91 S.Ct. at 2038–40. We have already concluded that Swint legitimately undertook a quick check of the hotel room and bathroom to ensure that no potentially armed fourth person remained inside. Ample evidence on the record supports the conclusion that the marijuana in the bathtub and the butts in the ashtray were located where one could inadvertently see them while carrying out such a security check. He was therefore justified in seizing the evidence without a warrant.

### 3. Agent Philip's Entry into the Bathroom

The government argues that a similar analysis supports Agent Philip's seizures of items from above the bathroom ceiling. It contends that he was legitimately within the bathroom and that the evidence above the ceiling was in plain view.

The record is somewhat confused regarding the circumstances of Agent Philip's entry into the bathroom. The pretrial stipulation of facts reported that he entered the bathroom "[a]fter Agent Swint left the bathroom". At trial, however, he testified that he entered "to see what was detaining" Agent Swint. Given our conclusion that the second half of the government's argument (that the evidence was in plain view) is based on faulty analysis, we need not resolve this conflict. Rather, we will assume that Agent Philip legitimately entered the bathroom.

4. The "Plain View" Doctrine—Philip's Seizures

■ The government contends that once Agent Philip had entered the bathroom, he was entitled to seek out and seize the evidence above the bathroom ceiling under the "plain view" doctrine. We disagree.

When Agent Philip was standing on the bathroom floor, he could not see any seizable evidence. All he saw was a displaced soundproofing panel. The government has not argued that as he looked at the displaced panel, it was "immediately apparent" to Agent Philip that he was looking at evidence of a crime. *Coolidge v. New Hampshire, supra,* 403 U.S. at 466, 91 S.Ct. at 2038. Nor would such an argument be plausible, since Agent Philip did not even consider seizing the panel as evidence. Instead, Agent Philip became suspicious that he might be able to *find* evidence if he looked around above the ceiling. He therefore undertook a search to see what might

be up there. He climbed up onto the toilet and looked inside. From that vantage point, he saw "the first something". Although he could not tell what the "something" was, he reached inside and took it out. He then saw that it was "a weapon, and a package of green weed". At that moment, it is clear that Agent Philip had evidence in plain view. "But it is important to keep in mind that, in the vast majority of cases, *any* evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view' doctrine has been to identify the circumstances in which plain view has legal significance rather than being the normal concomitant of any search, legal or illegal." *Id.* at 465, 91 S.Ct. at 2037.

■ We do not question the reasonableness of Agent Philip's suspicion that if he searched above the ceiling he might find evidence. That is not the point. What is significant is that, without any prior approval by a detached magistrate, he launched himself on an exploratory search. And he did so at a time when "[t]here was no indication that evidence would be lost, destroyed, or removed during the time required to obtain a search warrant." *Mincey v. Arizona, supra,* 437 U.S. at 394, 98 S.Ct. at 2414. In fact, the only person with a right to enter the hotel room was in custody. When Agent Philip was standing on the bathroom floor, no evidence was in plain view. His warrantless search for such evidence was not justified by any exigent circumstances * and was therefore contrary to the Fourth Amendment. *Cf. United*

---

* Although the government has not attempted to persuade us that Agent Philip's search was justified by exigent circumstances, our dissenting brother's interest in that possibility prompted us to canvass the record with that in mind. We found no support for such a finding. Moreover, we believe that any chain of reasoning that turns Agent Philip's hypothetical "apprehension of danger" into a justification for his warrantless search would be irreconcilable with Supreme Court precedent.

At the time Agent Philip "ascended the throne", the six agents had the three defendants completely under control. The defendants were seated on the bed, unarmed, and either were handcuffed or could easily have been

handcuffed. The agents knew that no one else was on the premises. The fact that a gun was known to be hidden somewhere cannot, by itself, transform the situation into a crisis. A gun is not a bomb; it is dangerous only if a defendant is holding it. Were we to find an exigency whenever any plausible or implausible sequence of events might link a defendant with a gun's potential hiding place, we would allow warrantless searches of unlimited scope. "The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other." *Chimel v. California,* 395 U.S. 752, 766, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969).

*States v. Jackson,* 576 F.2d 749 (9th Cir. 1979) (officer stood in plain view of an open file drawer; his search through the file for evidence was unconstitutional, no matter how strong his suspicion that he would find evidence there).

In its brief, the government cites *United States v. Garcia,* 616 F.2d 210, 212 (5th Cir. 1980); *United States v. Arredondo-Hernandez,* 574 F.2d 1312, 1314–15 (5th Cir. 1978); and *James v. United States,* 418 F.2d 1150, 1151 n.1 (D.C.Cir.1969) for the proposition that "the plain view doctrine is not made inapplicable because a law enforcement agent may have to crane his neck, bend over, or squat". Examination of those cases, however, reveals that they were discussing a different "plain view" problem, a problem more accurately termed one of "open view". They were all analyzing the question of whether an officer intrudes upon a person's privacy—whether he conducts a search—when he looks at items that are visible *to the public.* Thus, the complete quote in *James, supra,* reads as follows:

> "That the policeman may have to crane his neck, or bend over, or squat, does not render the doctrine inapplicable, *so long as what he saw would have been visible to any curious passerby.*" *James v. United States, supra,* 418 F.2d at 1151 n.1. (Emphasis added.)

*See also United States v. Arredondo-Hernandez, supra,* 574 F.2d at 1314 n. 1. Such cases do not have any bearing on *Coolidge,* which determines what evidence may be seized without a warrant *after* an officer has justifiably penetrated a constitutionally protected area—an area that is not accessible to "any curious passerby". *See* 1 W. LaFave, *Search and Seizure* § 2.2, at 242–43.

■ *Coolidge* authorizes warrantless seizure of items in plain view only "to supplement the prior justification" for the warrantless search. *Coolidge v. New Hampshire, supra,* 403 U.S. at 466, 91 S.Ct. at 2038. The activities an officer may undertake to expand his field of view are therefore restrained by his excuse for the warrantless entry. The restraint is not a straitjacket: many emergency situations will justify fairly energetic undertakings. But it must always be the exigency that justifies the action; the "plain view" doctrine cannot, by itself, permit an officer to indulge in a frolic of his own. *Id.* at 468, 91 S.Ct. at 2039. In sum, where an officer's presence is limited to a particular justification or purpose, what is in plain view is restricted to what could be inadvertently seen when his movements are made pursuant to that purpose. We need not analyze what may have actually been in his mind; movements clearly outside the scope of his mandate cannot be termed inadvertent. *Cf. United States v. Weber,* 668 F.2d 552 at 554–555 (1st Cir., 1981).

The government would have us lengthen the leash between the exigency and the search; but once the nature of the exigency ceases to define the scope of plain view, the leash could be stretched without limit. A police officer who entered a student's dormitory room to break up a brawl would be allowed to clamber up the bookcases to see what sort of illicit matter might be hiding behind Madame Bovary. Such wide-ranging searches, not countenanced by the protective reflection of a neutral magistrate and not necessary to respond to an emergency, are precisely the invasions of privacy that the Fourth Amendment prohibits.

Since the evidence above the ceiling was seized in violation of his Fourth Amendment rights, its introduction denied appellant Guilbe a fair trial.

### III. The Sufficiency of the Evidence

■ Appellant Garcia urges that we reverse the trial court's denial of his motion for a judgment of acquittal. In reviewing the trial court's decision, we consider the evidence as a whole, *United States v. Indelicato,* 611 F.2d 376, 384 (1st Cir. 1979). We draw all inferences that may be reasonably drawn therefrom, in the light most favorable to the government. We then determine whether a reasonable person could find guilt beyond a reasonable doubt on each of the counts. *Id.*

The evidence at trial admissible as to Garcia showed that he was present in the hotel room with Guilbe and Farinas when the agents arrived. After the knock, Guilbe took a gun out of a handbag in the main hotel room. Several minutes later, the three defendants emerged together. In the meantime, Guilbe's gun had found its way into the bathroom and up above the ceiling, along with two other guns, marijuana, and cocaine. Other marijuana was in the bathroom tub, and two marijuana butts were in the main room's ashtray. This evidence supports the inference that Garcia was aware of the marijuana in the hotel room before the agents arrived. It supports the further inference that each defendant had brought one gun to the hotel room and that when the agent knocked they hid all three guns, the marijuana, and the cocaine. We cannot declare that no reasonable mind would ever conclude beyond a reasonable doubt, on the basis of this evidence, that Garcia (1) came to the room with a gun, knowing that marijuana and cocaine would be present, and (2) deliberately gave the gun to another defendant, agreeing that it should be hidden along with a measurable quantity of marijuana and along with cocaine that was intended for distribution. Such direct personal involvement would constitute a violation of the statutes under which Garcia was convicted. We find the evidence in this case more substantial than that adduced in *United States v. Mora*, 598 F.2d 682 (1st Cir. 1979) and *United States v. Mehtala*, 578 F.2d 6 (1st Cir. 1978), where no such direct personal involvement was shown. The trial court did not err in denying the motion for acquittal, based on the evidence that it had received at trial.

*The conviction of defendant Garcia is affirmed. The conviction of defendant Guilbe is vacated on the basis of the trial court's failure to suppress unconstitutionally seized evidence, and a new trial ordered.*

BAILEY ALDRICH, Senior Circuit Judge (concurring).

I join fully in Chief Judge Coffin's opinion, but wish to comment separately on the dissent. There is always a problem when a court applies the rule that warrantless searches, with defined exceptions, are unreasonable per se, *e.g., Katz v. United States*, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, to strike down an otherwise concededly reasonable search. And it is always nettlesome that the rule, designed to protect the public at large, invariably results in benefiting undeserving members. Given the constitutional requirement, the strength of the rule, however, is not in its flexibility, but in its inflexibility.

First, what the dissent does not say. It concedes that the items lay beyond plain view. It makes no claim of exigency in the sense of a danger of loss or destruction of evidence. As to finding exigency in the sense of personal apprehension, I think a government agent would be affronted. Armed officers bent on arrest; the defendants unarmed; a bolt for the bathroom ceiling, becoming a target on a pedestal, would have been suicidal. Moreover, nothing in the record suggests the men were not handcuffed, and it strains credulity to think they were not. And, surely, the officers could not be permitted to create an artificial exigency by leaving a door open, and the men loose and free to move about. *United States v. Griffith*, 7 Cir., 1976, 537 F.2d 900, 904. With respect, that it threatened their safety is invention; no officer testified to it. In such absence I find it impossible to sustain the government's burden by inferring that four, or even three officers would have been concerned with a possible gun available only by standing on the toilet in another room.

It was natural, knowing a gun to be around—unless defenestrated—to want to look for it. So would it be if there were known to be drugs or other desirable items, but probable cause is a justification for a warrant, not a substitute.

Turning to standing, even assuming that defendants initially pushed the ceiling panel back, I question the inference that they left it "ajar" as "notice to anyone entering the room," and hence refuting privacy. More

likely they thought it restored, and it thereafter fell open. From personal experience I would take notice that such perversity is customary. In any event, even if it did "attract investigation," privacy was manifestly intended.

To come to more basic matters, I am troubled by the concept of measuring a hotel guest's privacy by what is customarily used. Would it permit officers a free look under the carpet? In the toilet tank? A guest might wish to put something private in a place not customarily used to keep it from an overly inquisitive chambermaid, or, indeed, from prying trespassers. Nor does it seem persuasive that a guest could not complain if a repairman were to enter the ceiling space from outside. Management could insist on employees entering anywhere in case of need. *United States v. Bomengo,* 5 Cir., 1978, 580 F.2d 173, *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1022, 59 L.Ed.2d 75. The fact that this diminishes the guest's expectation of privacy does not confer government rights. *Stoner v. California,* 1964, 376 U.S. 483, 489, 84 S.Ct. 889, 893, 11 L.Ed.2d 856; *United States v. Jeffers,* 1951, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59.

Furthermore, dwelling on the use of the ceiling's being an abuse of his tenancy—a matter between him and the hotel—cannot avoid the fact that the officers could not reach the gun without further trespassing on the privacy Guilbe purchased by renting the room. If Jones stole an envelope, even a government envelope, and put drugs inside and locked the whole thing in his suitcase, the officers could not justify their invasion of the suitcase by pointing out that Jones had no right to the envelope. Even assuming no right of privacy in the ceiling, there were substantial rights in the bathroom. In the dissent's seeming principal authority, *United States v. Agapito,* 2 Cir., 1980, 620 F.2d 324, *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40, a motel case, the court said, "We emphasize that the agents had a legal right to be where they were." *Id.* at 331. Only with difficulty, and the invocation of the plain view exception, has the court supported the search of the bathtub. To stand on the toilet and reach into the ceiling aperture, went a big step beyond. I do not quarrel with weighing the need against the invasion, but I believe the dissent substantially misapprehends both.

To return to the beginning, unlike the dissent, particularly in its discussion of *Chimel v. California,* 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, I do not read *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), as opting for judicial flexibility in determining, on a case to case basis, what is reasonable. Rather, the Court complained that "[w]hen a person cannot know how a court will apply a settled principle to a recurring factual situation, that person cannot know the scope of his constitutional protection, nor can a policeman know the scope of his authority." *Id.* 101 S.Ct. at 2864. A warrant is standard procedure. To stretch ourselves to devise excuses only encourages laxity and, ultimately, more judicial fodder.

BREYER, Circuit Judge (dissenting in part).

I dissent from the court's reversal of the conviction of appellant Guilbe Irizarry. The district court in this case denied the appellant's suppression motion and then later sustained the reasonableness of the search at trial because the district court believed that the search was justified by "exigent circumstances." That is to say, the district court found the search "reasonable" in light of the risks to the searching officers and the nature of the intrusion upon privacy interests. The government has not abandoned that theory on appeal. And, the record supports the district court, particularly if reasonable factual inferences are drawn in its favor. *Cf. United States v. Weber,* 668 F.2d 552 at 558–559 (1st Cir., 1981), and *on petitions for rehearing,* at 565 (1st Cir. 1981); *United States v. Sears,* 663 F.2d 896, 902–04 (9th Cir. 1981).

The record indicates that the following events occurred. Six officers went to Room 360 of the Isle Verde Holiday Inn as part of

a drug raid seeking the arrest of several persons throughout the city. They expected to find one man. Instead they found three, one of whom they saw through a window holding a gun. Before coming out of Room 360, one of the suspects reached through a hole that had been pushed open in the bathroom ceiling and placed the gun in the space beyond. (Other guns and narcotics were also hidden there.) He evidently failed to pull the ceiling panel back over the entire hole, leaving the opening half uncovered. One officer then left to find adequate transportation, which—because of the raid's equipment needs and the surprising number of suspects—was not readily available. The remaining officers decided that, since hotel guests and curious onlookers were beginning to congregate outside the room, they should. move the suspects back inside. Three or four of the officers went with the three suspects back into the room where they were to wait twenty to twenty-five minutes for a police van. Agent Swint immediately looked into the bathroom to see if anyone else was there. Soon thereafter agent Philip entered the room to see if Swint was all right; he walked past the three suspects sitting on the bed, entered the bathroom, saw the half-opened hole in the ceiling and looked inside, presumably for the gun. There was no search of wardrobes, drawers, or any other closed space in the rooms. These facts—all directly supported or reasonably inferred from the record—are sufficient, in my view, to support the district court's decision for two related sets of reasons.

1. The Supreme Court's discussion in *Rakas v. Illinois*, 439 U.S. 128, 143–44 n.12, 99 S.Ct. 421, 430–31 n.12, 58 L.Ed.2d 387 (1978) seems to me to require a holding here that Guilbe, as well as Garcia, lacks standing to assert a Fourth Amendment claim. The Supreme Court there makes clear that standing exists only if the record contains some facts from which one might infer a "legitimate expectation of privacy." *See United States v. Miller*, 636 F.2d 850 (1st Cir. 1980). Such an expectation is "legitimate" only if it is one that "society is prepared to recognize as reasonable," and it

must have a "source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." The only fact in the record here suggesting that Guilbe might have had a "reasonable" or "legitimate" expectation of privacy in the space above the ceiling when (as this court today holds) Garcia did not, is that Room 360 was registered to Guilbe (though he was apparently not living there). This fact alone, in my view, is insufficient. *Compare United States v. Weber*, 668 F.2d at 560.

For one thing, the right that Guilbe obtained from the hotel to remain under the ceiling of Room 360 was not a right to break through the partition and reach into a space over the ceiling. It was not a right to invade any niche, cubbyhole, conduit, passage, air conditioning vent, water pipe or any other imaginable place outside the room's physical boundaries—particularly when he could break through to such space only through the use of physical force. *See Rakas v. Illinois*, 439 U.S. at 145–47, 99 S.Ct. at 431–32. Guilbe had no right to exclude others from the areas between the walls and ceilings of adjoining hotel rooms. *See Rakas v. Illinois*, 439 U.S. at 143–44 n.12, 99 S.Ct. at 430–31 n.12; *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980). Had a hotel employee, repairman, or any other person been quietly working in a space between the walls, having entered that space from outside the room (or for that matter from inside the room assuming a legitimate presence there) Guilbe could not have complained. Rather, it is the hotel that had every right to complain about Guilbe's unlawful entry through force into a space that it owned, controlled and did not rent. *Cf.* Civil Code of Puerto Rico, Art. 1445, 31 L.P.R.A. § 4052. The Supreme Court has written that a "burglar plying his trade in a summer cabin during off season," despite a "thoroughly justified subjective expectation of privacy" has no expectation that is "legitimate." *Rakas v. Illinois*, 439 U.S. at 143–44 n.12, 99 S.Ct. at 430–31 n.12. How can a

registration slip here make any more "legitimate" Guilbe's interest in a space outside the physical bounds of his room?

For another thing, unlike the summer cabin burglar, Guilbe could not even have had much of a *subjective* expectation of privacy in an open cubbyhole—at least none which he took any reasonable precaution to protect. *See Rawlings v. Kentucky*, 448 U.S. at 105, 100 S.Ct. at 2561; *Rakas v. Illinois*, 439 U.S. at 152, 99 S.Ct. at 435; *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977). Guilbe and the other suspects left the ceiling panel ajar—clear notice to anyone entering the room that something was wrong with the ceiling. This fact was likely to draw a hotel employee to investigate the space rather than to warn outsiders that privacy was intended. *See Morale v. Grigel*, 422 F.Supp. 988, 992 (D.N.H.1976). *Cf. United States v. Cleary*, 656 F.2d 1302, 1305 (9th Cir. 1981); *United States v. Ramapuram*, 632 F.2d 1149, 1156 (4th Cir.), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

The room that Guilbe rented was not in his own home, a condominium, or an apartment house. It was in a hotel. As both the Second Circuit and the Fifth Circuit have recognized, although "an individual's Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish.... [T]here is ... an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home." *United States v. Agapito*, 620 F.2d 324, 331 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980) (quoting *United States v. Jackson*, 588 F.2d 1046, 1052 (5th Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979)). The additional facts that the space at issue here was not Guilbe's but the hotel's, that it was apparently entered by force, that it was left in a condition that would attract, rather than repel, investigation, all suggest that this space between the walls was not a "place in which society is prepared, because of its code of values and its notions of custom and civility, to give deference to manifested expectations of privacy." *United States v. Taborda*, 635 F.2d 131, 137–38 (2d Cir. 1980). If I am correct, then, as the court holds in the case of Garcia, there are not sufficient facts in the record "from which a court might reasonably infer ... standing." Majority Opinion at 557. And, even though the district court did not discuss standing, its decision must be affirmed. *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

2. At the very least, the facts just discussed show a diminished privacy interest in the space that was searched. And, given the very limited extent of any legitimate privacy protection here, I do not see how this court can overrule a district court's determination that the search was reasonable. Certainly the record facts reveal *some* risk—*some* danger—to the officers from the presence of a nearby gun. The facts that there were three suspects, not one; that a gun had been seen by the officers; that the officers had to wait with them for twenty to twenty-five minutes; that there was noise and confusion outside the room; all justify some concern on the part of the officers. The thought that the missing gun was only a few feet away in the bathroom in an open hole above their heads could reasonably have increased their concern for their own safety. Perhaps it would have been better practice to handcuff the suspects and shut the bathroom door, but that could well not have alleviated all of the officers' legitimate concerns. And, when the fact that they did not go through drawers or closets but simply looked into so obviously suspicious and "non-private" a place as the half-opened ceiling space is added to this legitimate concern for safety, it becomes impossible for me to say that the officers did not behave reasonably when a district court has concluded that they did.

I find no absolute rule of law, either in the Constitution itself or in prior precedent, requiring reversal here. The Constitution itself uses the phrase "unreasonable" searches and seizures, a word that, as the

Supreme Court held in *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1736–35, 18 L.Ed.2d 930 (1967), calls for "balancing the need to search against the invasion which the search entails." Indeed, in language recently quoted with approval by the Supreme Court, Mr. Justice Black pointed out that the Fourth Amendment

> prohibits only 'unreasonable searches and seizures. The relevant test is not the reasonableness of the opportunity to procure a warrant, but the reasonableness of the seizure under all the circumstances. The test of reasonableness cannot be fixed by *per se* rules; each case must be decided on its own facts.'

*Coolidge v. New Hampshire*, 403 U.S. 443, 509–10, 91 S.Ct. 2022, 2059–60, 29 L.Ed.2d 564 (1971) (concurring and dissenting opinion) (quoted with approval in *South Dakota v. Opperman*, 428 U.S. 364, 372–73, 96 S.Ct. 3092, 3098–99, 49 L.Ed.2d 1000 (1976)). Given the risk to safety posed by the nearby presence of guns, and the limited privacy interest, this search seems to me to be "reasonable."

There are, of course, a plethora of subsidiary legal rules, stating, for example, that warrantless searches of areas in a house outside the immediate control of an arrested person are unlawful, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); that warrantless searches of an automobile's passenger compartment (pursuant to an arrest) are lawful, *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); that warrantless seizures of items in "plain view" are lawful, *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), and so forth. *See generally* W.R. LaFave *Search and Seizure* § 6.7 (1978). These subsidiary rules, however, do not seem to require that a reasonable search be held unlawful or an unreasonable search be allowed simply because the search falls on the wrong side of the line that they draw, for there is no absolute line that will separate for all future cases the safe from the dangerous, the reasonable from the unreasonable. Rather, these opinions, offering the guidance of precedent for police and courts alike, appear sufficiently flexible to take differing circumstances into account, *compare Chimel v. California, supra, with New York v. Belton, supra,* and nowhere seem to relieve a court of all responsibility for assessing the circumstances of an individual case against the ultimate constitutional touchstone of "reasonableness."

In any event, the rules set forth in recent Supreme Court decisions seem to me to support, rather than to condemn, the search at issue here. The strongest contrary precedent is *Chimel v. California, supra,* in which the Court condemns warrantless searches outside the area subject to the arrested person's immediate control. *Chimel*, however, concerns a search of a *house* —where privacy expectations are explicitly protected by the Fourth Amendment, which consecrates "the right of the people to be secure in their persons, *houses*, papers and effects." (Emphasis added.) In the case of houses, one might wish to err, if at all, on the side of privacy. When the court has considered places where the interest in privacy is less intense, however, it has allowed warrantless searches well outside the area delineated in *Chimel*. Thus, in *Belton v. New York, supra*, the Court allowed a search of a car's glove compartment for marijuana well after the suspects had been taken away from the car and there was no possibility that they might have obtained access to the compartment to destroy evidence. *See Robbins v. California*, 453 U.S. 420, 423, 101 S.Ct. 2841, 2844, 69 L.Ed.2d 744 (1981); *United States v. Chadwick*, 433 U.S. at 12–13, 97 S.Ct. at 2484–2485. Since the privacy interest in the ceiling space here is significantly weaker than that in an automobile glove compartment and since it is more important to look nearby for a gun than to look across the road for marijuana, it seems to me that this is a stronger case for allowing the search than *Belton*. *Chimel*, which concerns a home, not an unrented ceiling space in a motel, does not hold to the contrary.

Finally, I might add that affirmance of the district court's opinion for the reasons here stated would not authorize the general search of a student's dormitory ("a student's home away from home"), *Morale v.*

*Grigel,* 422 F.Supp. at 997, or bring about the other evils that the court fears would accompany an extension of the "plain view" doctrine.[1]

For these reasons, I would affirm the district court's decision.

1. I might add two points about the arguments advanced in the concurring opinion in this case. First, we are reviewing a factual record made in a district court which upheld the search here at issue. We are not free to read the record subjectively, but must ask whether, drawing reasonable inferences against the defendants, it supports the district court's conclusion. Thus, I cannot infer that defendants were handcuffed. And, I must infer there was some danger, both from the objective circumstances and from such subjective statements as that of agent Philip that in such circumstances "I am always worried about [damage inflicted upon my per-

son]." Even were I reading the record totally subjectively, however, I would still find some risk of harm, some danger, present here.

Second, whether or not agent Philip had a legal right to stand on the toilet, while relevant to the matter of "plain view," is not relevant to my understanding of this case. The question is one of the *strength* of defendant's privacy interest. That privacy interest was in the ceiling space. There is no significant *additional* invasion of his privacy arising out of the fact that the officer, lawfully in the bathroom ("to see what was detaining special agent Swint"), stood on the toilet.