March 25, 1993
 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-2010

 UNITED STATES,

 Appellee,

 v.

 ALEXANDER LOPEZ,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Ronald R. Lagueux, U.S. District Judge]
 

 

 Before

 Torruella, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 

 

William T. Murphy was on brief for appellant.
 
Zechariah Chafee, Assistant United States Attorney, with whom
 
Lincoln C. Almond, United States Attorney, was on brief for appellee.
 

 

 March 25, 1993
 

 BOUDIN, Circuit Judge. In the district court, Alexander
 

Lopez was convicted of possessing cocaine with intent to

distribute and with conspiracy to commit the same offense.

21 U.S.C. 841(a)(1), 846. The jury deadlocked on two

other counts, later dismissed, charging Lopez with possessing

a short barrel shotgun and with its use in drug dealing. 26

U.S.C. 5861(d); 18 U.S.C. 924(c)(1). On this appeal,

Lopez contests only the district court's refusal to suppress

evidence obtained at the time of his arrest. We affirm.

 The pertinent facts, developed mainly at the suppression

hearing, can be briefly stated. Early on the morning of June

22, 1991, Charles Perry, a long-time cocaine user, went to a

building in Providence, Rhode Island, to purchase cocaine.

The building was a decrepit three-story tenement and, on the

second floor, there was a kitchen, an adjoining bathroom, and

three adjoining bedrooms available for rent on a weekly basis

to tenants, who were expected to share the kitchen and

bathroom. On the morning of June 22, one bedroom, previously

used by prostitutes, was empty; one was occupied by a

respectable tenant away at work; and the last was used by a

cocaine dealer named Blackie for whom Lopez worked.

 Arriving at the second floor by the back stairs, Perry

found the door to the kitchen open and entered to find Lopez

and another man. Perry bought a small bag of cocaine from

Lopez and left to inject the cocaine. Several hours later,

 -2-

Perry returned. Finding the second floor door now closed, he

negotiated a sale from the outside, took his purchase

downstairs and found that he had bought baking soda.

Returning to the second floor, he pounded on the door and

yelled until admitted. There he found Lopez, the

unidentified man present on his first visit, and Blackie.

When Perry began to yell, Blackie leveled a sawed-off double-

barrel shotgun at Perry and told him to leave.

 Retreating to the yard outside, Perry continued to yell.

Blackie left, threatening Perry as he did so. Perry then had

someone call the police to report that Perry had been

threatened with a sawed-off shotgun. Lopez emerged and gave

Perry a packet of cocaine. Police cars, responding to a

radio alert, began to arrive. Pointing to the building,

Perry then described to several officers a male wearing green

camouflage trousers and no shirt. Officer Tombs, who arrived

separately, heard the description and saw Lopez standing in

the yard behind the building, without a shirt and wearing

green camouflage pants, apparently holding an object.

 Tombs, clad in uniform, called on Lopez to halt.

Instead, Lopez dashed into the building and ran to the second

floor. Tombs pursued, broke through two intervening doors,

and arrested Lopez in the little bedroom. As Tombs

handcuffed Lopez, a radio fell over, and six tiny baggies of

cocaine were disclosed. Other officers appeared, including

 -3-

Officer Vanderhorst, and a search for the shotgun ensued.

Vanderhorst, entering the bathroom, saw a ceiling tile

missing. He stood on the toilet, peered in, and saw a big

bag, which proved to have smaller bags of cocaine inside.

Then, looking in again, he saw a gun butt. As he climbed

down, possibly using a ceiling panel as a hand-hold, the

ceiling collapsed and spilled a sawed-off shotgun onto the

floor. From handcuffing to discovery of the gun, only a few

minutes passed.

 After a suppression hearing before trial, the district

court refused to suppress the shotgun or the cocaine found in

the bedroom and the bathroom. The court found that the

arrest leading to the discovery of cocaine in the bedroom was

based upon probable cause and that Lopez had no standing to

object to the search of the bathroom. On the issue of

standing, the court found that the bathroom was available to

anyone on the premises, had no outside lock, and engendered

no expectation of privacy. The cocaine and shotgun were

offered as evidence at trial. Lopez was convicted on the

cocaine counts.

 On this appeal, Lopez argues that as an authorized user

of the apartment, he had standing to object to the bathroom

search under United States v. Irizarry, 673 F.2d 554 (1st
 

Cir. 1982). In turn, the government defends the district

court's suppression ruling primarily by arguing lack of

 -4-

standing, citing United States v. Thornley, 707 F.2d 622 (1st
 

Cir. 1983). As a second string to its bow, the government

argues that exigent circumstances justified the search for

the shotgun without awaiting a warrant. We think the

standing issue a close call and prefer to affirm on the

merits of the Fourth Amendment claim.

 It is common ground that the Fourth Amendment forbids

only unreasonable searches and seizures; that normally a

search is unreasonable absent a warrant issued by a neutral

magistrate upon a showing of probable cause; and that to

excuse the lack of a warrant, the police must ordinarily

bring the case within one or more of a list of exceptions to

the warrant requirement. See generally Coolidge v. New
 

Hampshire, 403 U.S. 443, 477-78 (1971). A few of the
 

exceptions are huge, such as arrest for felony and search

incident to arrest, which embrace Lopez' arrest in the

bedroom--assuming probable cause to pursue him in the first

place. Most of the exceptions, however, are narrower and

more complex. 

 The exception with which we are concerned in this case

excuses the lack of a warrant where "exigent circumstances"

exist, requiring speed and making delay improvident.

Although the most frequent example is the threatened

destruction of evidence, e.g., Cupp v. Murphy, 412 U.S. 291,
 

294-96 (1973), a solid line of cases finds exigent

 -5-

circumstances where the safety of law enforcement officers or

the general public is threatened. E.g., Warden v. Hayden,
 

387 U.S. 294, 298-99 (1967); Criminal Procedure Project, 80
 

Geo. L.J. 939, 987 (1992) (collecting numerous cases). This

circuit has so held. E.g., United States v. Rengifo, 858
 

F.2d 800, 805 (1st Cir. 1988), cert. denied, 490 U.S. 1023
 

(1989).

 The question here, then, is whether the police had a

reasonable basis to believe that a threat to safety existed

of an urgency and magnitude that would justify a warrantless

search of the kind that occurred. In truth, two different

issues are embraced in this formula. One is the police

perception of danger, judged by what the officers saw and

knew at the time. The other, a legal issue for the courts,

is whether under the Fourth Amendment the perceived threat

justified their behavior. In this case, what the officers

saw and knew is largely apparent from the record. By a close

margin, we think their perception justified their conduct.

 The most important element is that the police had reason

to believe that Lopez had a sawed-off shotgun nearby, which

had been used only shortly before to threaten Perry. That

Blackie had done the threatening, not Lopez, was apparently

unknown to the officers; if they had known, it could only

have increased their concern since Blackie was still at

large. Thus, the police had ample basis for believing that

 -6-

an extremely dangerous weapon was lodged close at hand and

should be recovered as promptly as possible.

 It is hard to think that Lopez himself posed an

immediate danger. Although one in custody may yet present

risks, it appears that Lopez was handcuffed in the bedroom

and that other officers were there when the bathroom search

occurred. Still, the police had no assurance that Lopez was

acting alone (in fact, he was not), or that the apartment was

secure (there were actually two entrances on the second

floor). Officer Tombs thought that others might have been

with Lopez in the second floor apartment.1 The nature of

the building--a dilapidated, multi-tenant structure--lent

further weight to a reasonable concern that the shotgun might

be hidden nearby, recovered by others, and used again.

 The nature of the search is also important. This is not

because Lopez lacked "standing" as to the bathroom area (we

assume arguendo that he had standing), but because the degree
 

of intrusion has a bearing on the reasonableness of the

police action. It is one thing to break into and search a

family home, another to frisk an arrested suspect, another to

search a car, and yet another to make a protective sweep of

 

 1Tombs testified at the suppression hearing that when he
reached the second floor in pursuit of Lopez, he heard
within: "Footsteps, fast moving footsteps. I couldn't
determine how many people, how many, you know, subjects were
in the house. But there was footsteps running about the
house, inside the door."

 -7-

an already entered building to uncover other suspects. In

each such case, the extent of the intrusion, and the

proportionality of response to need, inform the

constitutional judgment.

 Here, the intrusion, although not minimal, was limited:

the officer saw the opening in the bathroom ceiling through

an open door, entered the empty room, and with little effort

saw the butt of the weapon. There was no new entry into a

private residence; the police were lawfully in the kitchen. 

And the search can be justified as one not merely for

evidence or even contraband but for a dangerous weapon in a

building where others might gain access to it. If the weapon

were not swiftly recovered, a search for others outside the

building might be needed. Thus, this was a proportionate

search, limited in its range, specific in its object, and

justified by exigent circumstances.

 There is considerable case law on exigent circumstances

but, as one might expect in this area, the cases are heavily

dependant on the facts. The closest case in this circuit

appears to be Irizarry, upholding a warrantless search of a
 

hotel room to the extent needed to assure that a suspected

armed "fourth person" did not remain within. 673 F.2d at

558. Irizarry, in which the fourth person was reasonably
 

believed to be hiding in the room, is a stronger case for a

warrantless search, but other circuits on facts closer in

 -8-

strength to our own have found them strong enough. E.g.,
 

United States v. Queen, 847 F.2d 346, 353 (7th Cir. 1988);
 

United States v. McKinney, 477 F.2d 1184, 1186 (D.C. Cir.
 

1973).2 We agree, cautioning that our own facts may press

close to the outer limit of the Fourth Amendment.

 Lopez' other challenge is to the lawfulness of the

original pursuit, and this claim can be answered more

swiftly. If the original entry was unlawful, the seizure of

the cocaine in the bedroom might be suppressed as the fruit

of the poisonous tree, see generally Wong Sun v. United
 

States, 371 U.S. 471, 484 (1963), and the ban might extend as
 

well (we need not decide the point) to the evidence found in

the bathroom and a volunteered statement at the police

station. Lopez says that the original pursuit was unlawful

because the attempted, and ultimately successful, seizure of

Lopez was not based on probable cause to believe that he had

committed a crime.

 On the contrary, the police had a reasonable basis to

believe that Lopez was the man who had leveled a shotgun at

Perry, even though in the event it turned out to be Blackie

who had held the weapon. Office Tombs, arriving to

investigate the crime, heard Perry describe an Hispanic male,

 

 2McKinney, peculiarly on point, sustained the
 
warrantless search of a hotel room--while the occupant was
out--after a bellman observed a sawed-off shotgun on the
table.

 -9-

shirtless and in camouflage pants, and saw a man fitting this

description standing near the building to which Perry had

pointed. When Tombs in uniform called on Lopez to halt,

Lopez instead fled. These circumstances including flight

gave Tombs reason to believe that Lopez was the culprit,

United States v. Vasquez, 534 F.2d 1142, 145 (5th Cir.),
 

cert. denied, 429 U.S. 979 (1976), and the belief in turn
 

justified entry under the "hot pursuit" doctrine, see
 

generally United States v. Santana, 427 U.S. 38, 42-43
 

(1976), and ultimately arrest.

 In sum, the shotgun and cocaine evidence was permissibly

seized and introduced at trial, and the conviction is

therefore valid. Accordingly, the judgment of the district

court is affirmed.
 

 -10-